1

2

3

4

5

6

7

8                              UNITED STATES DISTRICT COURT

9                          FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   JESUS PALACIOS, et al.,                      No.  1:14-cv-01804-DAD-SAB[1]

12                    Plaintiffs,

13        v.                                      ORDER

14   PENNY NEWMAN GRAIN, INC., et al.,

15                    Defendants.

16

17

18           This matter is before the court on an unopposed motion by named plaintiffs for:

19   (1) final approval of the class action settlement, (2) an incentive award, (3) approval of the *cy*

20   *pres* beneficiary, and (4) an award of attorneys' fees and costs.  Mot. Class Action Settlement

21   (Mot.), ECF No. 32-1.  The court held a hearing on January 29, 2016, at which R. Erandi Zamora

22   and Della Barnett appeared for plaintiffs, Christina Tillman appeared for defendant Penny

23   Newman Grain, Inc., and Paul Bauer appeared for defendants Universal Ag Services, Inc. and

24   Juan Zavala.  ECF No. 35.  As explained below, the court GRANTS the motion.

25

26   _____

27        [1] Judge Mueller heard the motions addressed by this order.  ECF No. 35.  The case was
     later reassigned to the Honorable Judge Dale A. Drozd, on February 18, 2016.  ECF No. 36.
28   Judge Mueller issues the following order because she heard the motion.

                                                    1

1   I.       FACTUAL AND PROCEDURAL BACKGROUND

2            Jose Palacios, Jesus Palacios, Alejandro Herrera Aguilar, Edgar Torres, and Sabas

3   Medina (collectively "named plaintiffs" or "plaintiffs") were employees of defendants Penny

4   Newman Grain, Inc., Universal Ag Services, and Juan Zavala (collectively "defendants").  Not. of

5   Remov. 36, ECF No. 1.  Plaintiffs worked as non-exempt, hourly employees in facilities operated

6   by Penny Newman Grain, a leading merchant in the international market for grains and feed by-

7   products.  *Id.*; *see also* Mot. Prelim. Approv. 9, ECF No. 24-1.

8            Named plaintiffs allege defendants violated the Fair Labor Standards Act, 29

9   U.S.C. § 201 *et seq*. (FLSA), various sections of the California Labor Code, California Business

10  and Professions Code § 17200 *et seq*., and the California Private Attorneys General Act, Cal. Lab.

11  Code § 2698 *et seq*. (PAGA).  These claims arose from defendants' alleged failure to pay

12  overtime wages, provide meal and rest breaks, pay penalties for missed breaks, pay all wages due

13  on termination, and reimburse plaintiffs for their out-of-pocket expenses.  Compl. ¶ 7, ECF No. 1.

14           Named plaintiffs filed a complaint in the California Superior Court for the County

15  of Fresno on August 1, 2014.  Not. of Remov. at 8.  They filed a first amended complaint on

16  September 26, 2014, *id.* at 34, and defendants removed the action to federal court on

17  November 18, 2014, *see generally id.*  After private mediation, the parties agreed to settlement.

18  *See* Mot. Prelim. Approv. at 10.  While the parties did not engage in formal discovery, defendants

19  voluntarily produced complete time and payroll records and other data for all the putative class

20  members, which enabled plaintiffs' counsel to calculate the putative class members' unpaid back

21  pay and penalties with a high degree of confidence.  *Id.*

22           A.       Preliminary Class Settlement Approval

23           On April 22, 2015, named plaintiffs filed an unopposed motion for (1) preliminary

24  approval of the class action settlement; (2) provisional certification of the class and appointment

25  of class counsel; (3) approval of the form and method of class notice; and (4) the scheduling of a

26  final fairness hearing.  Mot. Prelim. Approv., at 13–27.  The court granted named plaintiffs'

27  motions.  Prelim. Approv. Order (Order) 20, ECF No. 28.  The court conditionally certified the

28  /////

2

1  following class:

2      [T]he non-exempt employees of Defendant Universal Ag Services
3      who worked at the facilities operated by Defendant Penny Newman
       in California at any point in time from August 10, 2010 to January
       15, 2015, and who do not properly and timely opt out of the
4      Settlement Class by having requested exclusion.

5  *Id.*

6      The court's preliminary approval came with four reservations, however.  First, the

7  court was concerned with the "clear-sailing" provision of the agreement.  *Id.* at 14 (citing *In re*

8  *Bluetooth Headset Prods. Liab. Litig.* ("*Bluetooth*"), 654 F.3d 935, 942, 947 (9th Cir. 2011)).  In

9  the agreement, defendants and their attorneys agreed not to oppose any application for attorneys'

10  fees or costs by class counsel, so long as their application was consistent with the settlement

11  agreement.  *Id.*  The court asked parties to provide information sufficient to determine the

12  reasonableness of the agreed fee, "for example by providing information with which the court

13  may compare it to a lodestar award."  *Id.*

14      Second, the court was concerned with plaintiffs' requests for incentive awards,

15  noting such awards "are not to be given routinely" without some justification.  *Id.* at 15 (citing

16  *Morales v. Stevco, Inc.*, No. 09–00704, 2011 WL 5511767, at *12 (E.D. Cal. Nov. 10, 2011)).

17  The court ordered each named plaintiff to provide "a detailed declaration describing his or her

18  current employment status, any risks he or she faced as a class representative, specific activities

19  he or she performed as a class representative, and the amount of time he or she spent on each

20  activity."  *Id.*  The court noted it would also assess whether each requested award was excessive.

21  *Id.*

22      Third, the court was concerned about the reasonableness of settlement

23  negotiations, and asked the parties for information about their mediation to assess the settlement's

24  reasonableness. *Id.* at 16 (citing Manual For Complex Litigation (MCL) § 21.61 (4th ed. 2004)).

25      Finally, the court was concerned with putative class members releasing their

26  claims even if they did not "receive a notice packet [when] for instance, the notice packets [we]re

27  returned as undeliverable."  *Id.* at 16.  The court noted "[t]his aspect of the [s]ettlement

28

1    [a]greement may not sufficiently protect absent class members' due process rights." *Id.*  The

2    court ordered the parties to be prepared to explain how the notice provision was fair.  *Id.*

3        **B.    Key Terms of Settlement Agreement**

4            The parties submitted the instant motion for final approval of the class settlement

5    on December 18, 2015.  *See generally* Mot.  Under the settlement agreement, defendants agreed

6    to pay a gross settlement amount ("GSA") of $600,000.  Barnett Decl. #2 Ex. A at 4, ECF No. 32-

7    3.  The GSA includes enhancement awards for named plaintiffs, class counsels' attorneys' fees,

8    litigation expenses and costs, and all costs of settlement administration.  *Id.* at 7.  The GSA does

9    not include defendants' share of payroll taxes.  *Id.* at 8–10.  The GSA of $600,000 is to be

10   distributed as follows:

11           1.   The enhancement amount awarded to named plaintiffs is $50,000—

12                $10,000 for each named plaintiff;

13           2.   The amount to be paid for class counsel is $150,000, or twenty-five percent

14                of the GSA;

15           3.   The amount to be paid for litigation expenses is $7,018.83.

16           4.   The PAGA payment is $10,000, $7,500 of which will go to the California

17                Labor Workforce Development Agency as its seventy-five percent share of

18                PAGA penalties, with $2,500 distributed to the class on a pro rata basis;

19                and

20           5.   The class administrator will receive $26,490.58.

21   *Id.*  After deducting these distributions from the GSA ($600,000 - $241,009.41) the settlement

22   amount available to putative class members would be $358,990.59.  *Id.*

23       **C.    Notice to and Response from Class Members**

24           The putative class consists of eighty members, fewer than originally expected due

25   to duplicative names in the original count, Smith Decl. 2, ECF No. 32-10.  On July 20, 2015, the

26   class administrator sent notice packets to members with available addresses, sixty-two in total.

27   *Id.* at 2.  The notice packets, printed in English and Spanish, were made up of a class notice, a

28   dispute form, and a consent form to join the action.  Further Notice Stipulation ("Not. Stip.") 2,

4

1   ECF No. 30.  Of the sixty-two packets mailed, ten were returned as undeliverable.

2   Smith Decl. at 2.  The class administrator re-mailed five of the returned notice packets after

3   finding updated addresses.  *Id.* at 3.

4          Because most, if not all, of the missing class members were monolingual Spanish

5   speakers, the class administrator made additional efforts by publishing a summary notice in *Vida*

6   *en el Valle*, a Spanish language newspaper in Fresno County, on July 29, 2015.  *Id.* at 3.  The

7   notice, drafted in English and Spanish, detailed the description of the lawsuit, terms of the

8   proposed settlement agreement, and details about the opt-out procedure.  Smith Decl. Exs. A–B.

9   The administrator established a toll-free telephone number to an English or Spanish operator,

10  available weekdays between 7:00 a.m. and 5:00 p.m., so putative class members could ask

11  questions or request notice packets.  *Id.*  Missing members had until October 3, 2015 to join the

12  action or to opt out.  *Id.* The class administrator received nine forms from missing members

13  affirmatively consenting to join the action, with zero opt-out requests.  *Id.*

14  II.    CLASS CERTIFICATION

15         Although the parties have not specifically stipulated a class exists, they have

16  submitted a proposed order with language confirming certification.  *See* ECF No. 32-14.  A party

17  seeking to certify a class must demonstrate the class meets the requirements of Federal Rule of

18  Civil Procedure 23(a) and at least one of the requirements of Rule 23(b).  *Amchem Prods., Inc. v.*

19  *Windsor*, 521 U.S. 591, 614 (1997).  The court must undertake the Rule 23 inquiry independently.

20  *West v. Circle K Stores*, No. 04–0438, 2006 WL 1652598, at *2 (E.D. Cal. June 12, 2006).

21         Under Rule 23(a), before certifying a class, the court must be satisfied that: (1) the

22  class is so numerous that joinder of all members is impracticable (the "numerosity" requirement);

23  (2) there are questions of law or fact common to the class (the "commonality" requirement);

24  (3) the claims or defenses of representative parties are typical of the claims or defenses of the

25  class (the "typicality" requirement); and (4) the representative parties will fairly and adequately

26  protect the interests of the class (the "adequacy of representation" inquiry).  *Collins v. Cargill*

27  *Meat Solutions Corp.*, 274 F.R.D. 294, 300 (E.D. Cal. 2011); Fed. R. Civ. P. 23(a).

28

5

Where, as here, named plaintiffs seek certification under Rule 23(b)(3), the court must find also that "'questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and effectively adjudicating the controversy.'" *Wal–Mart Stores, Inc. v. Dukes* (*Dukes*), 564 U.S. 338, 362 (2011) (quoting Fed. R. Civ. P. 23(b)(3)). The matters pertinent to these findings include: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; and (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing the class action. Fed. R. Civ. P. 23(b)(3)(A)–(D); *see also Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1191 (9th Cir. 2001).

Here, as noted, named plaintiffs seek certification of the following class for settlement purposes: "non-exempt employees of [d]efendant Universal Ag Services who worked at the facilities operated by [d]efendant Penny Newman in California at any point in time from August 10, 2010 to January 15, 2015 and who do not properly and timely opt out of the Settlement Class by requesting exclusion." Barnett Decl. Ex. A at 4. Also as noted, the court preliminarily certified the proposed class, finding initially it satisfied the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23(a) and 23(b)(3). Order at 5–9.

For purposes of final approval, the court determines whether the class ultimately satisfies Rules 23(a) and 23(b)(3).

A.    Numerosity

In its order granting preliminary approval, the court found the numerosity requirement met because the parties agreed the class had ninety-four employees. Order at 6.

Although there is no absolute numerical threshold for numerosity, courts have approved classes of, for example, thirty-nine, sixty-four, and seventy-one plaintiffs. *Murillo v. Pac. Gas & Elec. Co.*, 266 F.R.D. 468, 474 (E.D. Cal. 2010) (citing *Jordan v. L.A. Cnty.*, 669 F.2d 1311, 1319 (9th Cir. 1982), *vacated on other grounds*, 459 U.S. 810 (1982)). While the

1    class size has decreased to eighty members, it still surpasses the number of members approved in

2    past cases.  *See id*.  The class still remains large enough to satisfy the numerosity requirement.

3          B.     Commonality

4          In preliminarily approving the class, the court found the commonality requirement

5    met because there were questions and issues common to the class.  Order at 6.

6          To satisfy the commonality requirement, plaintiffs must do more than show "that

7    they have all suffered a violation of the same provision of law."  *Dukes*, 564 U.S. at 350.  Class

8    claims must depend upon a common contention that "must be of such a nature that it is capable of

9    classwide resolution—which means that determination of its truth or falsity will resolve an issue

10   that is central to the validity of each one of those claims in one stroke."  *Id.*  It is not so much that

11   the class raises common questions; what is necessary is "the capacity of a classwide proceeding to

12   generate common answers . . . ."  *Id.*  "[T]he merits of the class members' substantive claims are

13   often highly relevant when determining whether to certify a class."  *Ellis v. Costco Wholesale*

14   *Corp.*, 657 F.3d 970, 981 (9th Cir. 2011).

15         Here, there remain several issues common to the class: whether class members

16   were entitled to overtime pay, and if so, whether they were properly paid under the California

17   Labor Code; whether class members were properly paid under the FLSA; whether class members

18   were entitled to a third meal break; whether class members were entitled to statutory penalties;

19   and whether defendants provided plaintiffs with accurate pay records.  *See* Mot. Prelim. Approv.

20   at 10–15; *see also* Barnett Decl. # 2 ¶¶ 7–8, ECF No. 32-2.

21         These common issues satisfy the commonality requirement.  *See Ching v. Siemens*

22   *Indus., Inc.*, No. 11–4838, 2013 WL 6200190, at *4 (N.D. Cal. Nov. 27, 2013) (finding

23   commonality requirement satisfied where "the issues facing the class ar[o]se from common

24   questions involving [the] [d]efendant's calculation and payment of wages and overtime"); *Dilts v.*

25   *Penske Logistics, LLC*, 267 F.R.D. 625, 633 (S.D. Cal. 2010) (finding commonality requirement

26   satisfied where plaintiffs identified "common factual questions, such as whether [the]

27   [d]efendants' policies deprived the . . . class members of meal periods, rest periods, overtime pay,

28   /////

                                                    7

1   and reimbursement . . . and common legal questions, such as [the] [d]efendants' obligations under

2   [various sections of the] California Labor Code and California's Unfair Competition law").

3        C.      Typicality

4              In the preliminary order, the court found the typicality requirement was satisfied

5   because plaintiffs had the same or similar injury.  Order at 7.  Nothing before the court calls for

6   changing this preliminary finding.

7                 "'[T]he commonality and typicality requirements of Rule 23(a) tend to merge'"

8   because both act "'as guideposts for determining whether maintenance of a class action is

9   economical and whether the named plaintiff's claim and the class claims are so interrelated that

10  the interests of the class members will be fairly and adequately protected in their absence.'"

11  *Dukes*, 564 U.S. at 350 n.5 (citing *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157–58, n.13

12  (1982)).  A court resolves the typicality inquiry by considering "whether other members have the

13  same or similar injury, whether the action is based on conduct which is not unique to the named

14  plaintiffs, and whether other class members have been injured by the same course of conduct."

15  *Ellis*, 657 F.3d at 984.  Here, the class members suffered similar injuries when defendants failed

16  to comply with California and federal laws. This satisfies the typicality inquiry.  *See Murillo*, 266

17  F.R.D. at 475.

18       D.      Adequacy of Representation

19             In the preliminary order, the court found the named plaintiffs adequately

20  represented the interests of the class.  Order at 8.  Nothing before the court calls for changing this

21  preliminary finding.

22                To determine whether the named plaintiffs will protect the interests of the class,

23  the court must explore two factors: (1) whether the named plaintiffs and counsel have any

24  conflicts of interest with the class as a whole, and (2) whether the named plaintiffs and counsel

25  vigorously pursued the action on behalf of the class.  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011,

26  1020 (9th Cir. 1998); *see also Clersceri v. Beach City Investigation Servs., Inc.*, No. 10–3873,

27  2011 WL 320998, at *6 (C.D. Cal. Jan. 27, 2011) ("(1) the class representative must not have

28

1  interests antagonistic to the unnamed class members, and (2) the representative must be able to

2  prosecute the action 'vigorously through qualified counsel.'").

3         With respect to the first factor, nothing in the record before the court suggests the

4  representative plaintiffs have any conflicts of interest with the other class members. Because

5  plaintiffs' class-wide claims appear to be "completely aligned with [those] of the class," *Collins*,

6  274 F.R.D. at 301, the court concludes there is no conflict.

7         With respect to the second factor, "[a]lthough there are no fixed standards by

8  which 'vigor' can be assayed, considerations include competency of counsel and, in the context

9  of a settlement-only class, an assessment of the rationale for not pursuing further litigation."

10 *Hanlon*, 150 F.3d at 1021.  In addition, a named plaintiff will be deemed adequate "as long as the

11 plaintiff has some basic knowledge of the lawsuit and is capable of making intelligent decisions

12 based upon [the plaintiff's] lawyers' advice . . . ." *Kaplan v. Pomerantz*, 131 F.R.D. 118, 121–22

13 (N.D. Ill. 1990).

14        Plaintiffs' counsel have described their experience in class-action cases and,

15 specifically in class-action cases involving employment-related matters.  *See* Barnett Decl. #1

16 ¶¶ 18–19, 25–30, ECF No. 24-2.  Plaintiffs' counsel also describe the effort expended in the

17 action thus far, which includes investigation into the strengths and weaknesses of the class claims

18 and participation in private mediation with a highly experienced mediator.  *See id.* ¶¶ 8–15.

19 Additionally, plaintiffs have participated in the litigation process, *see id.* ¶ 9, which is a relevant

20 factor in determining the adequacy of representation.  *See Sepulveda v. Wal–Mart Stores, Inc.*,

21 237 F.R.D. 229, 244 (C.D. Cal. 2006).

22        The court finds the adequacy representation requirement satisfied.

23    E.     Predominance

24        In the preliminary approval order, the court concluded plaintiffs met the

25 predominance requirement because of the defendants' alleged failure to calculate wages and

26 overtime, to account for meal periods and rest periods, and to provide reimbursements. Order at 9.

27 Nothing before the court calls for changing this preliminary finding.

28

1    "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are

2    sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623.

3    Although predominance is similar to Rule 23(a)'s commonality requirement, it is more

4    demanding. *Id.* at 624.  To determine whether common questions predominate, the court must

5    consider "the relationship between the common and individual issues" by looking at the questions

6    that pre-exist any settlement. *Hanlon*, 150 F.3d at 1022.  Additionally, the predominance inquiry

7    focuses on the "notion that adjudication of common issues will help achieve judicial economy."

8    *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 958 (9th Cir. 2009).  Here,

9    the issues stemming from defendants' alleged conduct remain the same. *See* Barnett Decl. #1

10   ¶ 19.  There is no suggestion that individual issues exist apart from the calculation of individual

11   damages.  The predominance requirement is satisfied.

12        F.    Superiority

13        In the preliminary approval order, the court found plaintiffs satisfied the

14   superiority requirement in light of the burden inherent in the bringing of several individual suits

15   touching on the same or similar issues.  Order  at 9.

16        In resolving Rule 23(b)(3)'s superiority inquiry, the court should consider class

17   members' interests in pursuing separate actions individually, any litigation already in progress

18   involving the same controversy, the desirability of concentrating the litigation in one forum, and

19   potential difficulties in managing the class action, although the last two considerations are not

20   relevant in the settlement context. *Schiller v. David's Bridal, Inc.*, No. 10–0616, 2012 WL

21   2117001, at *10 (E.D. Cal. June 11, 2012) ("In the context of settlement, however, the third and

22   fourth factors are rendered moot and are not relevant . . . because the point is that there will be no

23   trial . . . ." (citing *Amchem*, 521 U.S. at 620)).

24        As in the preliminary approval order, the court concludes here that if class

25   members were to sue individually, each would bring essentially the same claims for relatively

26   small sums and yet might have to expend substantial resources to cover litigation costs. *See*

27   Barnett Decl. #1 ¶ 20.  The court is not aware of, and the parties have not cited, any other similar

28

1  litigation proceeding elsewhere.  The class action here is the superior means of litigating

2  plaintiff's claims.

3         G.     Conclusion

4         In sum, the court finds plaintiffs satisfy Rules 23(a) and 23(b), and final approval

5  of the class is appropriate.  The court will certify the following class: "non-exempt employees of

6  Defendant Universal Ag Services who worked at the facilities operated by Defendant Penny

7  Newman in California at any point in time from August 10, 2010 to January 15, 2015 and who do

8  not properly and timely opt out of the Settlement Class by requesting exclusion."

9  III.     SETTLEMENT AND FAIRNESS

10         A.     Legal Standard

11         When parties settle a class action, a court cannot simply accept the proposed

12  resolution; rather it must also satisfy itself that the proposed settlement is "fundamentally fair,

13  adequate, and reasonable."  *Hanlon,* 150 F.3d at 1026.  After preliminary certification and notice

14  to the class, a court conducts a fairness hearing before finally approving any proposed settlement.

15  *Narouz v. Charter Commc'ns, Inc.,* 591 F.3d 1261, 1267 (9th Cir. 2010); Fed. R. Civ. P. 23(e)(2)

16  ("If the proposal would bind class members, the court may approve it only after a hearing and on

17  finding that it is fair, reasonable, and adequate.").  A court must balance a number of factors in

18  determining whether a proposed settlement is in fact fair, adequate and reasonable:

19
20
21
22
> (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement.

23  *Hanlon*, 150 F.3d at 1026; *Adoma v. Univ. of Phx.*, 913 F. Supp. 2d 964, 974–75 (E.D. Cal.

24  2012).  The list is not exhaustive, and the factors may be applied differently in different

25  circumstances.  *Officers for Justice v. Civil Serv. Comm'n of City & Cnty. of S.F.*, 688 F.2d 615,

26  625 (9th Cir. 1982).

27  /////

28  /////

The court must consider the settlement as a whole, rather than its component parts; the settlement "must stand or fall in its entirety." *Hanlon*, 150 F.3d at 1026; *but see In re HP Inkjet Printer Litig.*, 716 F.3d 1173, 1190 n.5 (9th Cir. 2013) (in concluding the proper amount of attorneys' fees, the agreement as a whole need not stand or fall on the amount). Ultimately, the court must reach "a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Officers for Justice*, 688 F.2d at 625.

> 1.   The Strength of Plaintiffs' Case

When assessing the strength of plaintiffs' case, the court does not reach "any ultimate conclusions regarding the contested issues of fact and law that underlie the merits of [the] litigation." *In re Wash. Pub. Power Supply Sys. Secs. Litig.*, 720 F. Supp. 1379, 1388 (D. Ariz. 1989). The court cannot reach such a conclusion because evidence has not been fully presented and typically "settlements [are] induced in large part by the very uncertainty as to what the outcome would be, had litigation continued." *Id.* Instead, the court is to "evaluate objectively the strengths and weaknesses inherent in the litigation and the impact of those considerations on the parties' decisions to reach these agreements." *Id.*

While defendants deny they committed any illegal or wrongful acts, Barnett Decl. #2 Ex. A at 5, all parties agree plaintiff's case was strong and there was not much risk of losing on the merits or in losing at the class certification stage, Mot. at 12. Because the settlement achieves full and immediate compensation to class members who would likely have prevailed on the merits, this factor favors approving the settlement.

> 2.   The Risk, Expense, Complexity and Likely Duration of Further Litigation

"Approval of settlement is 'preferable to lengthy and expensive litigation with uncertain results.'" *Morales*, 2011 WL 5511767 at *10 (quoting *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.* (*DIRECTV*), 221 F.R.D. 523, 526 (C.D. Cal. 2004)). The Ninth Circuit has explained "there is a strong judicial policy that favors settlements, particularly where complex class action litigation is concerned." *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1101 (9th Cir. 2008) (citing *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992)). "'[I]t must

12

1    not be overlooked that voluntary conciliation and settlement are the preferred means of dispute

2    resolution.  This is especially true in complex class action litigation . . . .'" *Id.* (quoting *Officers*

3    *for Justice*, 688 F.2d at 625).

4             Here the parties have reached a reasonable voluntary agreement that will provide

5    class members with immediate substantial relief while avoiding delays in continued litigation,

6    which could be prolonged and expensive.  While this wage and hour class action is not

7    particularly complex, the amount offered in settlement renders a more favorable result unlikely.

8    This factor favors approval of the settlement.

9             3.      The Risk of Maintaining Class Action Status Throughout Trial

10            Neither party has discussed the risk of maintaining class action status up to and

11   throughout trial.  From reviewing the record and the pending motion, the court does not perceive

12   a risk that plaintiff will be unable to retain class action status.  This factor is neutral.

13            4.      The Amount Offered in Settlement

14            The proposed settlement is not to be judged against "a hypothetical or speculative

15   measure of what might have been achieved by the negotiators."  *Officers for Justice*, 688 F.2d at

16   625; *see also Collins*, 274 F.R.D. at 302 (a court must "'consider plaintiffs' expected recovery

17   balanced against the value of the settlement offer'" (quoting *In re Tableware Antitrust Litig.*,

18   484 F. Supp. 2d 1078, 1080 (N.D. Cal. 2007)).

19            The class administrator has calculated the settlement amounts for all eighty class

20   members.  Mot. at 10; Barnett Decl. #2 ¶ 2.  The average claim value is $4,450.12; the minimum

21   claim value is $2,705.52; and the maximum claim value is $24,814.20.  Mot. at 10.  Counsel

22   represent the proposed settlement provides "an early and extremely favorable settlement" for the

23   class, who "will receive all of their back wages owed, including interest and liquidated damages."

24   *Id.* at 12.  On balance, this factor weighs in favor of approving the settlement.

25            5.      The Extent of Discovery and the Stage of the Proceedings

26            "In the context of class action settlements, 'formal discovery is not a necessary

27   ticket to the bargaining table' where the parties have sufficient information to make an informed

28

13

1    decision about settlement." *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir.

2    1998) (quoting *In re Chicken Antitrust Litig.*, 669 F.2d 228, 241 (5th Cir. 1982)).

3          Plaintiffs' counsel represents that the parties engaged in informal discovery and

4    investigation and made repeated efforts to resolve the case. Barnett Decl. # 2 Ex. A at 5.

5    Additionally, on January 15, 2015, defendants and named plaintiffs participated in a lengthy

6    mediation before an experienced wage and hour and class action mediator, Jeffrey A. Ross, in

7    Oakland, California. *Id.* The mediation included extensive discussion and examination of the

8    parties' respective positions on the legal and factual issues raised by the class action. *Id.* While it

9    does not appear extensive discovery was conducted, the court is satisfied informal discovery

10   enabled the parties to reach a meaningful settlement agreement. This factor weighs in favor of

11   approving the settlement. This also allays the court's concerns at the preliminary approval stage

12   about the parties' negotiations.

13          6.    The Experience and Views of Counsel

14          Class counsel are experienced practitioners who have successfully litigated many

15   similar cases. Barnett Decl. #2 ¶ 15. For example, Della Barnett received her J.D. from UC

16   Berkeley School of Law in 1979, maintained a practice representing low-wage immigrant

17   workers, and has successfully litigated wage and hour class actions resulting in settlements of

18   $1.1 million, $22.4 million, $7.4 million, and $ 7 million for cases in 2015, 2005, 2004, and 2002,

19   respectively. *Id.* ¶ 20. Mr. Martinez graduated from UCLA law school in 1999 and has litigated

20   over thirty wage and hour class actions. *Id.* ¶ 25. Based on their experience, class counsel

21   believe the settlement is "more than reasonable and should be approved." *Id.* Given the

22   experience of counsel and their views, this factor favors approving the settlement. *See Barbosa v.*

23   *Cargill Meat Solutions Corp.*, 297 F.R.D. 431, 447 (E.D. Cal. 2013).

24          7.    The Presence of a Governmental Participant

25          This factor does not apply because no government entity participated in the case.

26   *In re Toys R Us-Delaware, Inc.--Fair & Accurate Credit Transactions Act* (*FACTA*) *Litig.*, 295

27   F.R.D. 438, 455 (C.D. Cal. 2014).

28

                                     14

1    8.    The Reaction of Class Members to the Proposed Settlement

2        "The absence of a large number of objections to a proposed class action settlement

3    raises a strong presumption that the terms of a proposed class settlement action are favorable to

4    the class members." *DIRECTV.*, 221 F.R.D. at 529.  Where there are no objections as here, the

5    presumption is particularly strong.  *Lo v. Oxnard European Motors*, LLC, No. 11–1009, 2012

6    WL 1932283, at *2 (S.D.Cal. May 29, 2012) (noting "the fairness of the terms of the settlement is

7    bolstered by the fact that no objections were made").

8        At the final approval hearing, the parties confirmed that no opt-out forms or

9    objections to the proposed settlement were filed or served on counsel.  This factor weighs in favor

10   of approving the settlement.

11       B.    Collusion

12       Where the parties negotiate a settlement agreement before a formal class

13   certification, as in the instant case, the court must evaluate the settlement for evidence of

14   collusion with a "higher level of scrutiny."  *Bluetooth*, 654 F.3d at 946.  "Collusion may not

15   always be evident on the face of a settlement, and courts therefore must be particularly vigilant

16   not only for explicit collusion, but also for more subtle signs that class counsel have allowed

17   pursuit of their own self-interests and that of certain class members to infect the negotiations."

18   *Id.* at 947.

19       A few such signs may include: (1) a disproportionate distribution of the settlement

20   to counsel; (2) a "clear-sailing" provision, under which the defendant agrees not to oppose an

21   attorney's fee award up to a certain amount, *id.*; and (3) when the parties arrange for fees not

22   awarded to revert to defendants rather than to be added to the class fund., *id.*

23       Here, class counsel seek $150,000, or twenty-five percent of the GSA.  Mot at 9.

24   The proposed distribution of the settlement to counsel is not disproportionate, and is within a

25   percentage range acceptable by the Ninth Circuit.  The first sign weighs in favor of finding no

26   collusion.

27       As to the second sign, the court previously has raised its concern regarding the

28   settlement's "clear-sailing" provision.  *See* Order at 14.  The court asked the parties to provide

15

1    "information sufficient to allow the court to determine the reasonableness of the agreed fee."

2    Order at 14.  While defendant agreed not to oppose class counsel's request for attorney's fees,

3    those fees will come from the settlement fund, so that provision does not raise concern.  *See*

4    *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 961 n.5 (9th Cir. 2009) (collusion generally inferred

5    from a "clear-sailing" provision where attorney's fees are paid on top of the settlement fund).

6    This factor weighs in favor of finding no collusion.

7            As to the third factor, an agreement for unrewarded funds to revert back to

8    defendants is not present here, because the settlement agreement provides that any remaining fees

9    will be distributed to an appropriate *cy pres* beneficiary.  This factor weighs in favor of finding no

10   collusion.

11           On the current record, the court does not find evidence of collusion.  The lack of

12   such evidence weighs in favor of approving the settlement.

13       C.    Attorneys' Fees, Costs, and Incentive Award

14           1.    Requests for Attorneys' Fees

15           Rule 23 permits a court to award "reasonable attorney's fees  . . . that are

16   authorized by law or by the parties' agreement."  Fed. R. Civ. P. 23(h).  Even when the parties

17   have agreed on an amount, the court must award only reasonable attorneys' fees.  *Bluetooth*,

18   654 F.3d at 941.  "Where a settlement produces a common fund for the benefit of the entire class,

19   courts have discretion to employ either the lodestar method or the percentage-of-recovery

20   method."  *Id.* at 942.  Courts should employ the lodestar method where, for example, awarding

21   twenty-five percent of a "megafund" would yield windfall profits for class counsel in light of the

22   hours spent on the case.  *Id.*  But here, where the "benefit to the class is easily quantified" in a

23   common-fund settlement, the court can employ the percentage-of-recovery method.  *Id.*  The

24   Ninth Circuit has held that the court may, but is not required to, compare the lodestar and the

25   percentage benchmark to determine if requested attorneys' fees are inappropriately high or low.

26   *Fischel v. Equitable Life Assurance Society of the United States*, 307 F.3d  997, 1007 (9th Cir.

27   2002) (finding no error where district court awarded fees under lodestar method and failed to

28

                                            16

1   compare lodestar with 25 percent benchmark). Overall, the goal is to produce a reasonable result.

2   *Bluetooth*, 654 F.3d at 942.

3          In the Ninth Circuit, the benchmark for percentage-of-recovery awards is twenty-

4   five percent of the total settlement award, which may be adjusted up or down. *Hanlon*, 150 F.3d

5   at 1029; *Ross v. U.S. Nat'l Bank Ass'n*, No. 07–02951, 2010 WL 3833922, at *2 (N.D. Cal.

6   Sept 29, 2010). Factors that may justify departure from the benchmark include: (1) the result

7   obtained; (2) the risk involved in the litigation; (3) the contingent nature of the fee; (4) counsel's

8   efforts, experience, and skill; and (5) awards made in similar cases. *Vizcaino v. Microsoft Corp.*,

9   290 F.3d 1043, 1048–50 (9th Cir. 2002).

10         "The twenty-five percent benchmark rate, although a starting point for analysis,

11  may be inappropriate in some cases. Selection of the benchmark or any other rate must be

12  supported by findings that take into account all of the circumstances of the case." *Id.* at 1048.

13  "[T]he exact percentage varies depending on the facts of the case, and in most common fund

14  cases, the award exceeds that benchmark." *Vasquez v. Coast Valley Roofing, Inc.*, 266 F.R.D.

15  482, 491 (E.D. Cal. 2010); *Williams v. Centerplate, Inc.*, No. 11–2159, 2013 WL 4525428, at *7

16  (S.D. Cal. Aug.26, 2013) (concluding an award of attorneys' fees in the amount of 30 percent of

17  the common fund, or $195,000 was reasonable); *In re Activision Sec. Litig.*,723 F. Supp. 1373,

18  1377 (N.D. Cal. 1989) (noting "nearly all common fund awards range around 30%").

19         Here, class counsel request an attorneys' fee award of twenty-five percent or

20  $150,000, the benchmark proportion. The court finds the fee request is reasonable because

21  counsel obtained an early settlement and favorable result per class member, while avoiding

22  increased costs and uncertainties of litigation. *See Vasquez*, 266 F.R.D. at 492 (result favorable

23  where 56 employees were to receive a recovery of $2,600 per employee); *see also Ching*, 2014

24  WL 2926210, at *7 (noting "the overall result and benefit to the class from the litigation is the

25  most critical factor in granting a fee award"). Additionally, class counsel handled the case on a

26  contingent fee basis, Barnett Decl. #2 ¶ 26, and courts have long recognized the public policy of

27  rewarding attorneys for accepting contingent representation in appropriate cases. *See In re Wash.*

28  *Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1299 (9th Cir. 1994) ("It is an established

practice in the private legal market to reward attorneys for taking the risk of nonpayment by paying them a premium over their normal hourly rates for winning contingency cases."). Finally, the experience of class counsel also supports a twenty-five percent award. The four attorneys who represent the class, Della Barnett, Erandi Zamora, John Hill, and Enrique Martinez, have successfully litigated a number of similar cases. Barnett Decl. #2 ¶ 15. Class counsel will be awarded attorneys' fees in the amount of $150,000, or 25 percent of the common fund.

### 2.   Requests for Costs

The court also must determine an appropriate award of costs and expenses. Fed. R. Civ. P. 23(h). "[I]n evaluating the reasonableness of costs, the judge has to step in and play surrogate client." *FACTA,* 295 F.R.D. at 469 (quoting *Matter of Cont'l Ill. Sec. Litig.,* 962 F.2d 566, 572 (7th Cir.1992)). Here, class counsel avers that the combined unreimbursed costs total a modest $7,018.83, including "$5,000 for one-half the cost of the mediator and $2,18.83 in other miscellaneous expenses, including mileage, filing fees, postage, hotel fees for the named plaintiffs, parking, jury fees, costs of service, and other normal litigation costs." Barnett Decl. #2 ¶ 29. The costs requested reflect no surcharge, and are supported by counsel's records, "prepared from invoices, vouchers, and check records." *Id.*

The court finds the costs requested to be reasonable.

### 3.   Incentive Award

Each named plaintiff requests an incentive award of $10,000, or $50,000 for all five named plaintiffs combined. Barnett Decl. #2 ¶ 17. Generally speaking, incentive awards are meant to "compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaking in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Rodriguez*, 563 F.3d at 958–59. While such awards are fairly typical in class action cases, *id.* at 958, the decision to approve such an award is a matter within the court's discretion, *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 463 (9th Cir. 2000).

In determining whether to approve an incentive award, courts may consider the following factors: (1) the risk to the class representative in commencing suit, both financial and

18

1   otherwise; (2) the notoriety and personal difficulties encountered by the class representative;

2   (3) the amount of time and effort spent by the class representative; (4) the duration of the

3   litigation; and (5) the personal benefit (or lack thereof) enjoyed by the class representative as a

4   result of the litigation. *Van Vranken v. Atl. Richfield Co.*, 901 F. Supp. 294, 299 (N.D. Cal.

5   1995).

6            With respect to the first factor, plaintiffs contend that by initiating the instant case,

7   they shouldered a degree of personal risk, including financial liability if defendant prevailed and

8   reduced future employment prospects in plaintiffs' field of work.  Barnett Decl. #2 ¶ 18; Torres

9   Decl. ¶ 13, ECF No. 32-4.  For example, Mr. Torres was terminated due to pursuing this suit, but

10   still chose to pursue it anyways in the interest of changing working conditions.  Torres Decl. at 4.

11   Those risks are relevant factors in evaluating an incentive award request. *See Staton v. Boeing

12   Co.*, 327 F.3d 938, 977 (9th Cir. 2003).  The first factor weighs in favor of granting an incentive

13   award to plaintiffs.

14            With respect to the second factor, nothing in the record suggests the litigation

15   gained any particular notoriety.  This factor is neutral.  *See Ogbuehi v. Comcast, Inc.*,

16   No. 13-00672, 2015 WL 3622999, at *13 (E.D. Cal. June 9, 2015).

17            With respect to the third factor, plaintiffs state they engaged in significant work

18   personally in moving this case forward.  Barnett Decl. #2 ¶ 18; Torres Decl. ¶ 5.  This work

19   included assisting class counsel in investigating the case, speaking with other workers about the

20   case, and taking uncompensated time off work to travel from Fresno to Oakland to attend the

21   mediation.  Torres Decl. ¶ 5.  Because plaintiffs expended reasonable efforts and were involved in

22   the mediation, this factor weighs in favor of granting them each an incentive award.

23            With respect to the fourth factor, the litigation of this case was not protracted; the

24   case was initiated in August 1, 2014 in Fresno County Superior Court, Not. of Remov., removed

25   to this court in November 2014, *id.*, and settled as a result of a mediation session held in Oakland,

26   California on January 15, 2015, Barnett Decl. #2 Ex. A at 5.  Given the relatively modest length

27   of the litigation, the court finds the fourth factor neutral.  *Cf. Van Vranken*, 901 F. Supp. at 299

28   (where the class representative's "participation lasted through many years of litigation [,]" an

1   incentive award was appropriate); *see also Ogbuehi*, 2015 WL 3622999, at *14 (E.D. Cal. June 9,

2   2015).

3           With respect to the fifth factor, personal benefit enjoyed by plaintiffs, under the

4   class settlement agreement, plaintiffs will not gain any benefit beyond that gained as class

5   members. *See FACTA*, 295 F.R.D. at 472 (C.D. Cal. 2014) ("An incentive award may be

6   appropriate when a class representative will not gain any benefit beyond that he would receive as

7   an ordinary class member."). This factor weighs in favor of granting an incentive award.

8           On balance, the relevant factors favor granting an incentive award. However, the

9   court finds the requested incentive award to be excessive, for it is nearly two times the amount

10  typically deemed reasonable. *See, e.g., In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d at 463

11  (approving a $5,000 incentive award); *Ching*, 2014 WL 2926210, at *9 (approving a $5,000

12  incentive award and noting that in the Northern District, "a $5,000 incentive award is

13  presumptively reasonable"); *see also FACTA*, 295 F.R.D. at 470 (approving a $5,000 incentive

14  award). Considering the average claim per plaintiff ranges from $2,705.52 to $4,450.12, the

15  incentive award requested would also be two times the highest average claim. Additionally, the

16  award as requested is 8.3 percent of the common fund, a percentage higher than in *Staton*, where

17  the Ninth Circuit overturned a class action judgment that included an incentive award of six

18  percent of the common fund. 327 F.3d at 976–77.

19          On the other hand, the court finds the requested incentive award is warranted for

20  Mr. Torres. Mr. Torres spent more time than average assisting with the litigation and was

21  terminated based on the suit against the defendants. *See, e.g., Gallucci v. Boiron, Inc.*, No. 11–

22  2039, 2012 WL 5359485, at *10 (S.D. Cal. Oct. 31, 2012) (awarding higher incentive award to

23  named plaintiff who contributed more time and expense in seeing the case to fruition); *Hughes v.*

24  *Microsoft Corp.*, No. 93–0178, 2001 WL 34089697, at *13 (W.D. Wash. Mar. 26, 2001) (same).

25  The higher incentive award does not contravene case law in this circuit; with it, total incentive

26  awards amount to $30,000, or five percent of the gross settlement amount, less than the six

27  percent of the settlement amount found excessive in *Staton*.

28

1    In sum, the court grants a $10,000 incentive award to Mr. Torres and a $5,000

2    incentive award to each of the other named plaintiffs.

3         4.    Class Administrator's Fee

4    Plaintiff also requests the court approve administrative costs in the amount of

5    $26,490.58, to be paid to the third-party class administrator.  Mot. at 9.  The class administrator

6    itemizes that amount as follows:

7         Notification—$15,195.20.

8         Processing and Reporting—$1,706.50.

9         Distribution—$9,588.88.

10   The administrator's responsibilities included handling eighty claims.  Not. Stip.

11   at 2.  Despite additional efforts made to reach absent class members, the parties have not shown

12   why $26,490.58, is warranted here.  *See Ching*, 2014 WL 2926210, at *2 (approving an estimated

13   $15,000 claims administrator fee for sixty-eight claims); *Ozga v. U.S. Remodelers, Inc.*,

14   No. 0905112, 2010 WL 3186971, at *2 (N.D. Cal. Aug.9, 2010) (granting $10,000 to the claims

15   administrator for 156 claims); *Chu v. Wells Fargo Investments, LLC*, No. 05–4526, 2011 WL

16   672645, at *1 (N.D. Cal. Feb. 16, 2011) (granting $40,528.08 in costs for 1,320 class members

17   and $6,900,000 settlement amount).  Accordingly, the court approves the class administrator fee

18   in the amount of $20,000.  *See Vasquez,* 266 F.R.D. at 484 (approving $25,000 administrator fee

19   awarded in wage and hour case involving 177 potential class members).

20        D.    Notice to Absent Class Members

21   In the order granting preliminary approval, the court noted its reservations

22   regarding the parties' plan for notice to absent class members. Order at 16.  Specifically, the court

23   was concerned the parties' settlement obligated absent class members to release their claims, even

24   if they did not receive a payment and even if their notice packets were returned as undeliverable.

25   *Id.*  The court asked the parties to explain how this plan complied with the fairness requirement.

26   *Id.*

27   During the final approval hearing, counsel explained they decreased the number of

28   potential class members from ninety-four to eighty after checking for duplicate names.  Of the

eighty class members, sixty-two notice packets were sent to members for whom addresses were

identified.  Not. Stip. at 2.  Ten of these were returned as undeliverable.  Smith Decl. at 3.  Of

these ten, five were sent back out with updated addresses, *id*., with an unknown number

undelivered.  To reach unknown class members, the parties agreed to publish notices in a popular

Spanish newspaper in the Fresno area.  Not. Stip. at 2.   Additionally, the administrator

established a toll-free telephone number with an English or Spanish operator answering, Monday

through Friday from 7:00 am to 5:00 p.m., so putative class members could ask questions or

request notice packets.  *Id.*  Previously unidentified class members had until October 3, 2015 to

join the action or to opt out.  *Id.* The class administrator received nine forms from formally

missing members affirmatively consenting to join the action, with zero opt-out requests.  *Id.*

These additional efforts ensured class members were provided adequate notice

regarding their ability to join or opt out of the class.  *See In re Valdez*, 289 F. App'x 204, 206 (9th

Cir. 2008) (publication of deadline for filing claims to participate in class action settlement in

local newspapers for three consecutive weeks did not violate due process).  The parties have

addressed the court's concerns about notice to absent class members.

E.      *Cy Pres* Distribution

Because most class action settlements result in unclaimed funds, a plan is required

for distributing those funds.  *Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1305

(9th Cir. 1990).  *Cy pres* distribution allows unclaimed funds to benefit the entire class, albeit

indirectly.  *Id.* at 1305.  This approach requires the *cy pres* award to qualify as "the next best

distribution" to giving the funds directly to the class members.  *Dennis v. Kellogg Co.*, 697 F.3d

858, 865 (9th Cir. 2012).

"Not just any worthy charity will qualify as an appropriate *cy pres* beneficiary[;]"

there must be "a driving nexus between the plaintiff class and the *cy pres* beneficiary."  *Id.*  A *cy*

*pres* distribution is an abuse of discretion if there is "no reasonable certainty" that any class

member would benefit from it.  *Id.*

The parties have designated a charity to receive any residual funds not distributed

through the class action settlement: Central California Legal Services ("CCLS"), a nonprofit legal

22

services program serving California's Central Valley.  Barnett Decl. #2 ¶ 19.  In preliminarily approving the parties' settlement agreement, the court noted that at the final hearing it would require counsel to address the "reasonable certainty" standard set forth above.  Having considered the parties' responses, the court finds its concerns have been addressed.  First, the members of the class, including absent class members, live in the Central Valley.  Mot. at 17; Clason Decl. ¶¶ 12–14.  Second, CCLS supports projects that would benefit class members.  *See id.*  The gravamen of plaintiff's complaint is that the class members did not receive pay and benefits to which they were entitled under California and federal labor laws.   In 2015, CCLS opened 6,801 client case files and provided legal assistance to more than 13,000 persons, providing consultation, advice, and full-service representation in cases involving wage claims and other employment issues, among other matters.  Mot. at 18.  The court finds it is appropriate in this case to direct unclaimed funds to CCLS as a charity that assists residents of the Central Valley with their wage and hour rights.  *See id.* at 17; *see also Lane v. Facebook, Inc.*, 696 F.3d 811, 820–21 (9th Cir. 2012) (declining to require "that settling parties select a *cy pres* recipient that the court or class members would find ideal.  On the contrary, such an intrusion into the private parties' negotiations would be improper and disruptive to the settlement process.").

IV.   <u>CONCLUSION</u>

In conclusion, the court APPROVES the class settlement as follows:

1.     The court AWARDS an incentive payment of $10,000 to Edgar Torres and $5,000 each to class representatives Jesus Palacios, Jose Palacios, Alejandro Herrera Aguilar, and Sabas Medina;

2.     The court APPROVES Central California Legal Services (CCLS) as the *cy pres* beneficiary;

3.     The court AWARDS administration costs in the amount of $20,000 to the class administrator Gilardi & Co. LLC;

4.     The court APPROVES the PAGA payment of $7,500 to be distributed to the California Labor Workforce Development Agency; and

5.     The court APPROVES attorneys' fees in the amount of $150,000.00.

23

6.      The court APPROVES reimbursement of costs in the amount of $7,018.83.

IT IS SO ORDERED.

DATED:  May 26, 2016.

_____
UNITED STATES DISTRICT JUDGE

24